IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-297-FL

| | | |
|---|---|---|
| SHIBUMI SHADE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| BEACH SHADE LLC, and MATTHEW FINNERAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the court on plaintiff's motion for preliminary injunction (DE 17) and defendants' motion to dismiss for failure to state a claim. (DE 30). With benefit of extensive briefing, and hearing in November, 2023, for the following reasons, plaintiff's motion is granted in part and defendants' motion is denied in part.

## STATEMENT OF THE CASE

Plaintiff commenced this action June 5, 2023, and amended its complaint June 27, 2023.[1] Plaintiff asserts that defendants Beach Shade LLC ("Beach Shade") and Matthew Finneran ("Finneran") have infringed and continue to infringe plaintiff's patents, U.S. Patent Nos. 11,634,924 ("'924 Patent"), D989,350 ("'350 Patent"), and D990,605 ("'605 Patent"), which apply to plaintiff's beach shade product, the "Shibumi Shade."[2] Plaintiff seeks declaratory and

---

[1] Hereinafter, all references to the complaint ("compl.") are to the operative amended complaint at DE 16.

[2] Plaintiff in a separate action against the instant defendants has asserted actions for infringement of other patents, infringement of trade dress, and unfair and deceptive trade practices. See Shibumi Shade, Inc. v. Beach Shade LLC et al., 5:21-CV-256-FL ("Shibumi I").

injunctive relief together with compensatory and treble damages, and its attorneys' fees. Specifically, in the instant motion for preliminary injunction, plaintiff seeks to enjoin defendants from:

1. Continuing infringement of the claims of the '924, '350, and '605 patents; and

2. Continuing manufacture, importation, use sale, and offers to sell the "Beach Shade Cordless" or similar product, whether in person, in brick-and-mortar retail stores, or through defendant Beach Shade's website, social media, or third-party online retailers.

(Pl's Mot. (DE 17) at 1).

Plaintiff initially relied upon the declaration of its co-founder Dane Barnes ("Barnes"), correspondence between the parties, the patents, media articles covering plaintiff's product, webpages related to defendant's product, comments and correspondence from customers regarding the parties' products, and a declaration by Stephen Melamed ("Melamed"), a retained expert. Subsequently, plaintiff filed Barnes's supplemental declaration, Melamed's supplemental declaration, additional webpages, and materials from the prosecution histories of the patents at issue. Defendants rely on the sworn testimony of James B. Babcock ("Babcock"), a retained expert, and defendant Finneran, supported by webpages related to competing products, and plaintiff's first interrogatory to defendants.

Defendants moved July 12, 2023, for the court to provide for expedited discovery on issues relevant to the instant motion for preliminary injunction. Plaintiff responded in opposition and defendants replied. The court denied the motion September 15, 2023, set remaining deadlines for briefing on the preliminary injunction motion, and scheduled hearing on the motion for October 23, 2023. Hearing later was continued to November 6, 2023.

In the meantime, defendants filed the instant motion to dismiss on August 17, 2023. Plaintiff responded in opposition and defendants replied.

At hearing, the parties presented arguments on defendants' motion to dismiss plaintiff's claims for infringement of the '924 patent and under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") and on plaintiff's motion for preliminary injunction. The court dismissed plaintiff's UDTPA claim without prejudice, and took all other matters under advisement.

## STATEMENT OF FACTS

The relevant facts asserted in the complaint may be summarized as follows. Plaintiff is a North-Carolina based corporation which manufactures and sells the Shibumi Shade. (Compl. ¶ 9-10). The Shibumi Shade is a commercial embodiment of plaintiff's '924 patent, which describes a "system for providing shade onto a surface," (DE 16-7 at 2), and its '350 and '650 patents, both of which describe an "ornamental design for a shading system." (DE 16-9 at 2; DE 16-11 at 2).

Defendant Beach Shade is a North Carolina limited liability company engaged in the business of selling the accused product known as the Beach Shade Cordless ("the accused product"). (Compl. ¶¶ 20-21).[3] Plaintiff's Shibumi Shade is pictured below on the right, for side-by-side comparison with defendants' accused product, on the right.

 

---

[3] Defendants are enjoined preliminarily from selling their original product, the Beach Shade, by this court's February 8, 2022, order in a related case. See Shibumi Shade v. Beach Shade LLC, et al., No. 5:21-cv-256-FL ("Shibumi I). Only the complaint and evidence presented in the instant case are considered for purposes of this order.

3

(Id. ¶ 21).  Both products consist, in effect, of an arched frame, a canopy attached thereto, and a carrying case.

Plaintiff holds three patents relevant to the instant dispute.  The '924 patent is a utility patent covering a "system for providing shade onto a surface," including "a canopy configured for engagement with, and aerial suspension by, a[n arched] frame."  (DE 16-7 at 2).  The '350 and '605 patents are both design patents covering slightly different aspects of an ornamental arched shading system with a free-flowing canopy, as pictured below.  Compare (DE 16-9 ('350 patent) at 8 (fig. 6)) (showing a solid line running the length of the canopy) with (DE 16-11 ('605 patent) at 8 (fig. 6)) (representing the same line in dashed format, which delineates portions of the system that forms no part of the claimed design).



(DE 16-11 ('605 patent) at 8 (fig. 6)).

In addition, the court finds the following facts pertinent to the instant motion for injunctive relief.  The products differ in their canopy designs, method of attaching the canopy to the frame, and method of anchoring the apparatus to the surface.  The canopy of the Shibumi Shade is rectangular in shape.  The Beach Shade Cordless is octagonal, with four long sides and four short sides.  (DE 54-1 at 49).  Illustrations of the two canopy shapes are pictured below for side-by-side

4

comparison, with plaintiff's Shibumi Shade on the left and defendants' Beach Shade Cordless on the right.



(DE 58 at 4) (Shibumi Shade); (DE 62-2 at 6) (Beach Shade Cordless). The Beach Shade Cordless features a higher ratio of height to width, triangles with an area of approximately 14 square inches each cut out from the corners closest to the frame, and triangles with approximately 35 square inches cut out from the corners furthest from the frame.[4]

Both products join the canopy with the frame via a sleeve in the canopy through which the frame is threaded. (DE 54-1 at 41) (Shibumi Shade) (DE 36 ¶ 70) (Beach Shade). However, the canopy of the Shibumi Shade features two straps at its corners to keep the canopy in place, (DE 56-1 at 1) (noting the court's receipt of a physical example of the Shibumi Shade and accused product), whereas the accused product extends its sleeve to the bottom of the frame. (Id.). Finally, the Shibumi Shade's carrying case functions as a ground anchor when inverted and filled with sand, (DE 54-1 at 41), whereas the accused product relies on "threaded sand stakes," (DE 60 at 215),[5] into which the frame is inserted, that screw into the sand on a beach.

---

[4]    The court undertook its own measurements of the parties' physical exhibits, and all figures throughout this order therefore are approximate.

[5]    Whether the Beach Shade Cordless's anchoring mechanism may be called a "corkscrew" is the subject of an ongoing dispute between the parties. The court's use of defendants' terminology in this order has no bearing this dispute, which should be resolved as part of the court's claim construction.

**COURT'S DISCUSSION**

A.      Motion for Preliminary Injunction

        1.      Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22.

In an order granting or denying a preliminary injunction, the court must set forth findings of fact and conclusions of law bearing on the court's decision. Fed. R. Civ. P. 52(a)(2); see Ciena Corp. v. Jarrard, 203 F.3d 312, 321 (4th Cir. 2000). With respect to these findings of fact and conclusions of law, a preliminary injunction is decided "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing," and the findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits. See id.; see also Jack Guttman, Inc. v. Kopykake Enterprises, Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002) (explaining that a district court may "issue only a tentative claim construction and . . . base its resolution of a preliminary injunction motion upon that tentative claim construction").

        2.      Analysis

                a.      Likelihood of Success on the Merits

6

Plaintiff has demonstrated it is likely to succeed on the merits of its claims for infringement of its design patents as a basis for preliminary injunctive relief. Because the court herein grants plaintiff's motion for injunctive relief on the basis of its design patent infringement claims, the court does not consider whether plaintiff has demonstrated a right to injunctive relief as to its claim for infringement of its utility patent. See, e.g., Roe v. Department of Defense, 947 F.3d 207, 224 (4th Cir. 2020) (granting a preliminary injunction where plaintiff was likely to succeed on one claim).

i.      Claim Construction

Under federal law, "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor[.]" 35 U.S.C. § 171(a). Unlike a utility patent, "[a] design patent protects the nonfunctional aspects of an ornamental design[.]" Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995).

"Determining whether a design patent claim has been infringed requires, first, as with utility patents, that the claim be properly construed to determine its meaning and scope." Id. (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). Where design patents "typically are claimed as shown in drawings," the court may "provide a detailed verbal description of the claimed design, as is typically done in the case of utility patents," but need not do so "if it does not regard verbal elaboration as necessary or helpful." Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008). In construing a design patent, trial courts are cautioned not to rely excessively on detailed verbal descriptions, as "misplaced reliance on a detailed verbal description of the claimed design risks undue emphasis on particular features of the design rather than examination of the design as a whole." Crocs, Inc. v. International Trade Commission, 598 F.3d 1294, 1302 (Fed. Cir. 2010).

Both the '350 and '605 patents claim a free-flowing canopy attached on one side to an arch. The '350 patent claims both a full two-toned canopy, and the full arch, as pictured below.



('350 patent (DE 16-9) at 3); ('350 patent (DE 16-9) at 4); ('350 patent (DE 16-9) at 8). Plaintiff's intent to claim a two-toned canopy, or at least a canopy divided visually into two sections, is shown in the solid line horizontally bisecting the canopy in figures 1 and 6. Plaintiff's intent to claim the full arch is shown in the solid arched lines in figures 1 and 2. Other than these brief explanatory comments, the court will not undertake a detailed written description of the '350 patent, and relies on these exemplary drawings.

The '605 patent claims the canopy but portrays the line horizontally bisecting the canopy as a "dashed line," depicting "environmental subject matter or a portion of the shading system that forms no part of the claimed design," as pictured below.



8

('605 patent (DE 16-11) at 10); ('605 patent (DE 16-11 at 15). Some illustrations in the '605 patent, such as those immediately above, claim the arch in its entirety, while others claim only the portions of the arch that are in contact with the canopy and depict the rest of the arch in dashed lines. These are shown below.



('605 patent (DE 16-11) at 3); ('605 patent (DE 16-11) at 8). The court construes these illustrations as an attempt to claim a design for a two-toned or solid free-flowing rectangular canopy attached on one side to an arch, which must maintain its arched shape in areas in contact with the canopy but may take other shapes as it connects to the surface. For all other components of the design, the court relies on these exemplary drawings.

The court next considers whether any features of the designs are purely functional. See Oddz On Products, Inc., v. Just Toys, Inc., 122 F.3d 1396, 1404-05 (Fed. Cir. 1997) ("Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."); Richardson v. Stanley Works, Inc., 597 F.3d 1288, 1294 (Fed. Cir. 2010) (identifying in a design patent for a multitool "several elements . . . driven purely by utility," including a jaw that had to be located on the opposite end of the hammerhead and a crowbar that needed to be on the end of a longer handle).

9

Any shading system must have, at least, a covering and a supporting structure. It is not necessary, however, for the covering or even the supporting structure to take any particular shape. (See, e.g., DE 20-6 at 4-9) (showing a "stretchable spandex canopy," "a beach umbrella [with] tent flaps," "a standard umbrella," and a tent open on one side in addition to plaintiff's product). Even when the supporting structure is a single frame and the covering is supported in part by wind, as is the case with the parties' products, the supporting structure need not be an arch (see, e.g., DE 58 at 16) (depicting a partially wind-supported shade with a pole-like supporting structure), and the canopy need not be rectangular (see, e.g., id. at 15) (depicting semi-circular and irregularly shaped canopies attached to arched supporting structures). Where all functions of the claimed design could be performed by elements different from those described in the '350 and '605 design patents, there are no elements "driven purely by utility." Richardson, 597 F.3d at 1294. Accordingly, the court construes the patents according to the illustrations and comments provided herein and declines to filter out any elements of the claimed design.

ii.      Infringement

"To show a likelihood of success on the merits, a patentee must show that it will likely prove infringement of the asserted claims," but if defendants "assert[] an infringement defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue." ABC Corporation I v. Partnership and Unincorporated Associations Identified on Schedule "A", 52 F.4th 934, 942 (Fed. Cir. 2022).

"In determining whether an accused product infringes a patented design," the court asks whether "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." Crocs, Inc., 598 F.3d at 1303. "Minor differences between a patented design and an accused article's design cannot . . . prevent a finding

of infringement" if the patented design, considered as a whole, and the accused product are deceptively similar. Id. Finally, "[t]he infringement analysis must compare the accused product to the patented design, not to a commercial embodiment." Lanard Toys Ltd. v. Dolgencorp, LLC, 958 F.3d 1337, 1341 (Fed. Cir. 2020).

Both the accused product and plaintiff's design patents have large free-flowing canopies attached on one side to an arch. The canopy in plaintiff's design patents is perfectly rectangular, while defendant's technically is octagonal. For purposes of the ordinary observer, however, the accused product's canopy is rectangular in shape, because the triangular cutouts are so small, and the rest of the canopy so large, that the cutouts evade notice by the casual observer. The short side of defendant's shade is 7 feet 9 inches, while the cutouts on that side are each between 5 and 7 inches long. The long side, which is 14 feet 10 inches in length, features cutouts that are about 10 inches long. Thus, on a 142 square foot canopy, all the cutouts combined are about one square foot in area. The cutouts on the back of the canopy are especially difficult to discern. When flying on the beach or depicted in marketing materials, as pictured below, the canopy appears rectangular to the ordinary consumer.



(DE 55-6 at 3).

Evidence presented at hearing supports the conclusion that the octagonal canopy was not easily distinguishable from a previous rectangular iteration even by defendants themselves. Until the day of hearing, a previous version of defendants' product incorporating a rectangular canopy appeared beside the current octagonal version. (See 55-6 at 3). The cutouts are virtually invisible when the accused product is viewed from the front or back, as pictured below.

 

(DE 62-3 at 2) (left, showing view from the front); (62-4 at 2) (right, showing view from the back). Thus, an ordinary observer would be unable to distinguish the accused product from the patented designs based on the shape of the canopy.

The ordinary observer also would not be able to distinguish the accused product from the patented designs based on the color of the canopy. It is unclear whether the drawings in the '350 patent depicting a line bisecting the canopy represents the two-toned design of plaintiff's commercial embodiment, which the accused product does not incorporate, or simply a seam bisecting the canopy, which it arguably includes. (See '650 patent (DE 16-9) at 1, 3, and 6-9). Where the '605 patent features no such line, however, and has been construed by the court to cover both a two-toned and a solid canopy, the accused product's canopy is not distinguishable from the design protected by the '605 patent.

Finally, the arched support structure of the accused product is not distinguishable, either by an ordinary or sophisticated observer, from plaintiff's design patents. In sum, the accused product differs from the '605 patent only by virtue of small cutouts that are virtually unnoticeable

12

except by close examination. Thus, the ordinary observer, viewing the accused product as a whole, likely would be deceived into believing that the accused product is the same as the patented design. The accused product therefore infringes at least the '605 patent.

Defendants have highlighted several differences between the products, but all are drawn from a commercial embodiment of plaintiff's design patents rather than the patents themselves, in violation of Federal Circuit precedent. See Lanard Toys Ltd., 958 F.3d at 1341. Plaintiff manufactures a two-tone canopy and defendants' product is a solid color, but the '605 patent covers a solid canopy. (See DE 16-11 at 3) (indicating a lack of intent to claim only a two-toned design through use of a dotted line running the length of the canopy). Plaintiff's product includes, and the accused product omits, an anchoring cord, but the anchoring cord forms no part of either design patent. (See id.); (DE 16-9 at 3). While the accused product's canopy is shorter in length than plaintiff's product, both design patents lack exact measurements. (See generally (DE 16-9); (DE 16-11)). Plaintiff is not required to prove that the ordinary observer would be deceived into believing that both parties' products are the same, only that "the accused product is the same as the patented design." Crocs, Inc., 598 F.3d at 1303 (emphasis added). Accordingly, defendants' design infringes, at least, the '605 patent.

### iii. Validity

Defendants argue that the design patents are invalid where the invention described is primarily functional. The court disagrees.

"Invalidity due to functionality is an affirmative defense to a claim of infringement of a design patent, and must be proved by the party asserting the defense." L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1123 (Fed. Cir. 1993). When deciding whether a design "is

13

dictated by the function of the article of manufacture," the court undertakes "an analysis of the overall appearance," considering

> whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

PHG Technologies, LLC v. St. John Companies, Inc., 469 F.3d 1361, 1366 (Fed. Cir. 2006); see also Sport Dimension, Inc. v. Coleman Co., Inc., 820 F.3d 1316, 1322 (Fed. Cir. 2016) (applying this test and emphasizing that "design patents protect the overall ornamentation of a design, not an aggregation of separable elements"). "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." L.A. Gear, 988 F.2d at 1123.

The essential function of both products here is the provision of shade. Devices for providing shade come in a variety of designs, including umbrellas, tents of various configurations, and arched canopies such as plaintiff's. (See DE 60 at 92-63). Each design strikes some balance between competing features, such as shade area, compactness, stability, weight, durability, cost, whether the product functions without wind, noise level, and ease of assembly. See id.; (DE 62-1 at 51) (showing alternative sun shelters); (DE 62-1 at 52) (showing alternative sun shelters with a continuous arched frame); (DE 20-21 at 14) ("It's a little challenging on a packed beach to set up and not annoy everyone around you.").

Whether plaintiff's design "represents the best design" depends significantly on a given user's preferences. Defendants assert that the best design features easy assembly, "the most efficient shaped canopy that provides the greatest usable shade," and the best view of the beach, but have not provided any evidence that consumers actually value these aspects of the product.

14

(DE 38 at 18). Consumers who frequent more crowded beaches may prefer less shade in order to be able to find a spot more easily, and some may be willing to trade an unobstructed view of the beach for more privacy. (See DE 20-6 at 3, 4, 6); (see also DE 57-5). Defendants' expert opined that available alternatives were insufficient where they were "prone to inversion" at high wind speeds, heavier, more difficult to transport, featured lower "shade-to-weight ratio[s]," and "wasted material," (DE 60 at 145-47), however, this analysis assumes that all consumers prefer light, efficient shelters providing abundant shade. Evidence that tents and modified umbrellas remain, in some cases, more popular than either party's product shows this assumption to be unsupported. (See DE 57-5). Where consumers display heterogenous preferences and a shade device's utility is highly dependent on those preferences, plaintiff's patents do not necessarily cover the "best" design, and alternative designs would not necessarily adversely affect the utility of the article. See Ethicon Endo-Surgery, Inc. v. Covidein, Inc., 796 F.3d 1312, 1330 (Fed. Cir. 2015) (rejecting a finding of functionality based primarily upon user preference). This factor thus weigh in favor of plaintiff.

Whether alternative designs would adversely affect the utility of the specified article also depends on user preference. All shade devices must have some supporting structure, but the supporting structure need not be an arch, as the continued popularity of traditional umbrellas and tents shows. (See DE 57-5). Shades with an umbrella-like supporting structure may be more intuitive to set up, tent-like structures may provide wind protection, and both appear to be cheaper to produce. (DE 59 at 100-102). In the same vein, a free-flowing canopy is relatively noisy when compared with tents and umbrellas. (DE 59 at 220-21). Finally, while defendants argue that a rectangle is simply the most cost-effective canopy shape, its own evidence shows that modifications to this shape can actually increase the utility of the article, for example by reducing

15

the noisiness of the canopy flapping in the wind.  (Id.).  In addition, plaintiff's decision to offer a smaller version of its flagship product, the Shibumi Shade Mini, shows that even customers who value lightweight, large sun shades frequently choose a product that does not offer the greatest possible shade area.  (DE 20 at ¶ 35).  In sum, defendants' argument that plaintiff's design patents represent merely a solution to "a shade-to-weight ratio problem" oversimplifies consumer preferences and ignores successful alternative designs.  Thus, this factor also weighs in favor of plaintiff.

Multiple utility patents cover the instant design, including the '924 patent at issue in this case and U.S. Patent Nos. 10,753,117 ("'117 patent"), 10,190,330 ("'330 patent"), 11,111,690 ("'690 patent"), 11,255,103 ("'103 patent"), and 11,299,904 ("'904 patent"), all of which are at issue in the related case referenced above.  All these patents describe a system for providing shade onto a surface using an arched frame and a free-flowing canopy.  See (DE 16-7) ('924 patent); (Shibumi I DE 84-8) ('117 patent); ((Shibumi I DE 84-10) ('690 patent); (Shibumi I DE 84-12) ('103 patent); (Shibumi I DE 84-14) ('904 patent").  The existence of multiple utility patents covering the design weighs in favor of defendant.

Defendants point to three instances in which plaintiff's "advertising touts particular features of the design as having specific utility."  Sport Dimension, 820 F.3d at 1322.  First, defendants argue that plaintiff differentiates the Shibumi Shade and the Shibumi Shade Mini by the square footage of shade each device provides.[6]  Defendants also assert that plaintiff's setup instructions tout the product's easy assembly.  These statements, however, do not tout any

---

[6]     The advertisements relied upon are excerpted in defendants' brief, but they have not been submitted as exhibits or provided to the court as a permanent link.  The current version of plaintiff's website does not contain the information referenced in defendants' brief.  See SHIBUMI, BEACH SHADES, https://perma.cc/6RKZ-SN5U.  The parties are strongly encouraged to use a link preservation service, such as perma.cc, for future references to webpages.

"<u>particular</u> features of the design," emphasizing rather the function of the product as a whole. <u>Sport Dimension</u>, 820 F.3d at 1322 (emphasis added). Finally, defendants cite to plaintiff's statement that its canopy will not "fly away in a strong gust or tumble down the beach" where it "has no rigid structure." (DE 35 at 18).[7] While this statement arguably identifies the specific utility of a particular feature, it is the only one that does so across all plaintiff's advertising. This factor therefore weighs in favor of plaintiff.

Finally, defendant asserts that all the elements in plaintiff's design are dictated by function, relying on general statements regarding claim construction by other courts, (<u>see</u> DE 35 at 19), and conclusory statements by its expert that both the canopy and the frame are "entirely functional." (<u>See</u> DE 36 ¶¶ 89, 97). Based on the analysis above, the elements in the claimed designs do not appear primarily functional. This factor weighs against finding the design patents invalid.

In sum, defendants fail to show that plaintiff's design patents are invalid as primarily functional. Where plaintiff also has shown that the accused product likely infringes at least its '605 patent, plaintiff has shown a likelihood of success on the merits.

   b. Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Id.</u>

---

[7] Defendants do not provide a citation for this statement, and the court is unable to find it in the record, however, it appears on the "FAQ" section of plaintiff's website. <u>See</u> Shibumi, Frequently Asked Questions, https://perma.cc/25GL-ZX27.

Specifically, "in a patent infringement suit," "to satisfy the irreparable harm factor, . . . a patentee must establish" also "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." Apple, Inc. v. Samsung Elecs. Co., 695 F.3d 1370, 1374 (Fed. Cir. 2012). Ergo, where "the accused product would sell almost as well without incorporating the patented feature," there is not a likelihood of irreparable harm from the alleged infringement. Id. at 1374-75. "The relevant question is . . . to what extent the harm resulting from selling the accused product can be ascribed to the infringement." Id. at 1375.

Harm that can be easily remedied by money damages, axiomatically, does not constitute irreparable harm. Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012); see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."), abrogated on other grounds by Winter, 555 U.S. 7. However, "[w]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." Multi-Channel, 22 F.3d at 552; Celsis In Vitro, 664 F.3d at 930 ([L]oss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Further, where the accused product is in direct competition with plaintiff's product there may also be irreparable harm. Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."); Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1354 (Fed. Cir. 2012) (holding that the patentee demonstrated irreparable harm where it was forced to compete for the same customers in the same markets as its infringer).

Plaintiff makes a clear showing that it is at high risk of irreparable injury. See Apple, Inc. v. Samsung Elects. Co., 678 F.3d 1314, 1324 (Fed. Cir. 2012). A founder of plaintiff testified that since the introduction of the accused product, "sales for the Shibumi. . . . shade are down approximately 18% as compared to May last year." (DE 19 ¶ 31). Plaintiff was forced to lower its prices by about 7%, increase the amount spent on advertising, and sell a higher percentage of its products via Amazon in order to minimize lost sales. (See id.); Presido Components, Inc. v American Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."). These claims are buttressed by reviews showing some consumers chose the accused product instead of plaintiff's. See, e.g., (DE 20-21 at 10) ("We saw several of the more expensive shade too, and didn't see any reason to spend more."); (DE 20-21 at 17) ("I had been eyeing a competitor's shade for over a year [and eventually] decided to get the Beachshade."); (DE 20-26 at 2) ("I am concerned that a product so similar at a lower price could impact our sales."). Troublingly, plaintiff presented testimony that defendants' actions have encouraged other imitators, (DE 19 ¶ 19), and that defendants' overseas manufacture of the accused product facilitates infringement by entities not immediately answerable to American courts (see id. ¶ 14(d)); (DE 20-31 at 3). Based on the foregoing evidence, irreparable injury is likely in absence of the sought injunctive relief.

Defendants assert that plaintiff's focus on a lack of brand development by defendant Beach Shade, defendants' purchase of advertising key words related to plaintiff's product, and the release date of the accused product are irrelevant considerations, however, no part of the court's analysis relies on these aspects of the case. Defendants' criticism of plaintiff's statements regarding product designation is also irrelevant to the analysis of irreparable harm. Finally, as the court has explained

in a previous order in the related case, defendants' reliance on <u>Edge-Works Manufacturing Co. v. HSG, LLC</u>, 285 F. Supp. 3d 883 (E.D.N.C. 2018) is misplaced where "plaintiff has not relied upon 'unsupported assertions' alone . . . [but] has proffered direct evidence of customers' perceptions and decision-making calculus as demonstrated by their comments and reviews." <u>Shibumi I</u> (DE 41 at 31).

      c.      Balance of Equities

"The district court must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." <u>Metalcraft of Mayville, Inc. v. The Toro Co.</u>, 848 F.3d 1358, 1369 (Fed. Cir. 2017).

Here, the balance of equities tilts towards the grant of an injunction given that the harm to plaintiff if one is not granted outweighs the potential harm to defendants if one is granted. While an injunction will cause defendants hardship, it is not distinct from the harm any alleged infringer would suffer if enjoined. The possibility that an accused infringer would be put out of business "does not insulate it from the issuance of a preliminary injunction" if other factors weigh in favor of the relief, <u>Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.</u>, 132 F.3d 701, 708 (Fed. Cir. 1997), as they do here.

In addition, "[i]t is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." <u>LEGO A/S v. ZURU Inc.</u>, 799 F. App'x 823, 832 (Fed. Cir. 2020); <u>see, e.g.</u>, <u>Trebro Mfg. v. Firefly Equipment, LLC</u>, 748 F.3d 1159, 1171 (noting as relevant to the equities inquiry that "[plaintiff] is losing business to a new entrant selling a likely-infringing product"). Further, as discussed below, the requirement of a Rule 65(c) bond will ameliorate any potential harm caused by the injunction. <u>See, e.g.</u>, <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d 264, 285 (4th Cir. 2002) ("While the defendants would incur the monetary costs of complying with

20

the injunction . . . they would be protected by the substantial bond posted by [plaintiffs].").

Defendants' argument that a preliminary injunction would protect "an improper monopolistic empire [and] allow patent holders to . . . layer utility and design patent protection simultaneously for the same functional aspects" goes only to plaintiff's likelihood of success on the merits, and the shortcomings of this argument are discussed in section A(2)(a), above.

> d.      Public's Interest

A preliminary injunction is in the public's interest where there is an important societal commitment to protecting the rights secured by a valid patent. See Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988). And the "public is best served by enforcing patents that are likely valid and infringed." Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006). Further, the fact that the instant "patent[s] deal[] with [a niche industry]" indicates that an injunction "may not have a broad-reaching effect" that would impact the public's interest negatively. See Trebro Mfg., 748 F.3d at 1172. Finally, there does not appear to be "some critical public interest that would be injured by the grant of preliminary relief." Hybritech, 849 F.2d at 1458. Defendants' argument that the public is best served by promoting lawful competition is invalid in light of the court's finding that plaintiff is likely to prove that the accused product infringes its valid patents.

> e.      Scope of Injunction

Rule 65 requires that "[e]very order granting an injunction . . . state its terms specifically; and describe in reasonable detail . . . the acts or acts retrained." Fed. R. Civ. P. 65(d)(1). "Injunctions must be narrowly tailored and should prohibit only unlawful conduct." CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 461 (4th Cir. 2000). An injunctive "order must be tailored as precisely as possible to the exact needs of the case." Id.; see, e.g., Nat'l Audubon Soc'y v. Dep't

of Navy, 422 F.3d 174, 181 (4th Cir. 2005) (stating "the injunction issued by the district court was overly broad" and remanding "with instructions to narrow the injunction"). "Absent this narrowing, . . . [an] injunction[] will not survive appellate review." Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 818 (4th Cir. 2004). In addition, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." Pashby v. Delia, 709 F.3d 307, 331 (4th Cir. 2013).

Here, when limited to the portions related to the meritorious patent infringement claim, the preliminary injunction sought by plaintiff is neither overly broad nor insufficiently precise. Plaintiff seeks to enjoin infringement of the patents-in-suit by, specifically, enjoining the manufacture, import, use, sale, and offers to sell the accused product through various retail avenues. This is narrowly tailored to the conduct that is likely unlawful, that is, infringing, as discussed above. Moreover, the Federal Circuit has affirmed analogously phrased injunctions. See Metalcraft, 848 F.3d at 1369 (affirming as sufficiently definite "district court's order enjoin[ing] [defendant] from 'making, using, selling, and offering to sell lawnmowers equipped with platform suspension systems that infringe [plaintiff's] patent'").

     f.    Bond

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." Pashby, 709 F.3d at 332.

"In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party

for harm it suffers as a result of an improvidently issued injunction or restraining order." Hoechst Diafoil Co. v. Nan Ya Plastics, Inc., 174 F.3d 411, 421 n.3 (4th Cir. 1999). "The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint." Lab'y Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015); accord Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1362 (10th Cir. 1990).

Defendants assert that defendant "Beach Shade would likely be forced to go out of business and/or into bankruptcy" if an injunction issues, but have neither offered evidence to support this claim nor suggested a bond amount. This showing is insufficient for the court to set an evidence-based, reasonable bond. Plaintiff therefore is required to post a nominal bond of $1,000.00.

B.     Motion to Dismiss

Defendants move to dismiss plaintiff's claim for infringement based on prosecution history estoppel and violation of the all-elements rule. See Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1279 (Fed. Cir. 2001).

1.     Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further

23

factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

a.      Infringement of the '924 Patent

Defendants argue that plaintiff fails to plausibly allege infringement where additional components would need to be added to the accused product and where the prosecution history includes an instance in which plaintiff distinguished prior art similar to the accused product. The court finds these arguments inappropriate to the procedural posture of this case.

When suing for infringement, "a patentee need only plead facts sufficient to place the alleged infringer on notice as to what he must defend . . . a plaintiff in a patent infringement suit is not required to specifically include each element of the claims of the asserted patent." McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1357 (Fed. Cir. 2007); see also Bot M8 LLC v. Sony Corporation of America, 4 F.4th 1342, 1353 (Fed. Cir. 2021) ("there must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim."). The complaint in this action straightforwardly identifies the accused product and the patent assertedly infringed. Plaintiff also included an eight-page chart demonstrating its contentions through images, captions, and diagrams. (DE 16-8). At this early stage of litigation, plaintiffs have done all that is required.

Defendants contend that the accused product does not infringe the '924 patent unless the purchaser "independently purchase[s] separate anchors, cords, and clips – not sold, marketed, or included with the Beach Shade Cordless," violating the "all elements rule of patent law" (DE 31 at 2-3). Though defendants' brief is not a model of clarity, the court interprets these statements as a contention that the accused product does not include "a second end of the canopy defin[ing] a

tail, the tail being engageable with or coupleable to an anchor for securing the canopy into position," as claim 13 of the '924 patent recites. (DE 16-7 at 17).

Before deciding infringement, the court must determine the meaning of the disputed claim term according to the detailed process for claim construction mandated by patent law and its local rules. See Covad Communications Group, Inc.; 262 F.3d at 1279 (holding that a determination of no infringement under the all elements rule "must be remised upon a proper claim construction"); E.D.N.C. Patent Rs. 304.1-.6. "Claim construction at the pleading stage – with no claim construction processes undertaken – [is] inappropriate." In re Bill of Lading Transmission and Processing System Patent Litigation, 681 F.3d 1323, 1343 n.13 (Fed. Cir. 2012); see also Nalco Company v. Chem-Mod, LLC, 883 F.3d 1337, 1349 (Fed. Cir. 2018) (finding that where "[d]efendants' arguments boil down to objections to [plaintiff's] proposed claim construction . . . [the] dispute [was] not suitable for resolution on a motion to dismiss"). The court may not, therefore, decide that an accused product does not embody a particular claim term before determining the meaning of that term.

Defendant also urges the court to rule that its product does not infringe where plaintiff distinguished its invention from an object similar to the accused product as part of the prosecution history. While it may be appropriate in some instances to consider prosecution history on a motion to dismiss, this is not such a case. See Amgen Inc. v. Coherus BioSciences Inc., 931 F.3d 1154, 1159-60 (Fed. Cir 2019) (finding disclaimer of all "salt combinations other than the particular combinations recited in the claims" where patentee had emphasized the word "particular" and "referred to its particular salts three times in the span of two pages"). At a minimum, the entire prosecution history must be before the court before a decision on disclaimer may be rendered. Seachange Intern., Inc. v. C-COR, Inc., 413 F.3d 1361, 1372 (Fed. Cir. 2005) ("[W]e consider the

25

prosecution history to determine whether the patentee disclaimed disavowed subject matter . . . [and i]n doing so, we examine the entire prosecution history").  Only a small portion of the prosecution history now is before the court, rendering any decision on the scope of the claims in the '924 patent premature.  This question should be deferred for a stage in the litigation when the parties have had an opportunity to conduct discovery.[8]  Defendants' motion therefore is denied with respect to the claim for infringement of the '924 patent where any infringement determination would be premature.

---

[8]    The court previously denied defendants' motion for discovery in advance of the preliminary injunction hearing based on defendants' failure to show any compelling reason for "broad-based, time-consuming discovery" at an early stage of the case.  (DE 33 at 4).

**CONCLUSION**

Based on the foregoing, plaintiff's motion for injunctive relief (DE 17) is GRANTED IN PART as set forth herein. Within 14 days of entry of this order, plaintiff shall post security of $1,000.00 with the Clerk of Court, and shall file notice thereof. Upon posting of the bond described herein, defendants and those in active participation with them are enjoined, pending further order of the court, from:

1) Continuing infringement of the claims of the '605 Patent; and

2) Continuing manufacture, importation, use, sale, and offers to sell the "Beach Shade Cordless" product, whether in person, in brick-and-mortar retail stores, or through defendant Beach Shade's website, social media, or third-party online retailers.

In addition, defendants' motion to dismiss (DE 30) is DENIED IN PART as set forth herein and at hearing. Plaintiff's claims for infringement of the '917, '350, and '605 patents may proceed. Plaintiff's UDTPA claim is dismissed without prejudice as explained at hearing.

Defendant shall file answer to those portions of the amended complaint relevant to plaintiff's claims for infringement of the '917, '350, and '650 patents 14 days from entry of this order.

SO ORDERED, this the 29th day of December, 2023.

LOUISE W. FLANAGAN
United States District Judge

27